AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

**FILED**
CLERK, U.S. DISTRICT COURT

**4/19/2024**

CENTRAL DISTRICT OF CALIFORNIA
BY:  CGM      DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT

APR 1 9 2024

CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

| United States of America | |
| v. | Case No. **2:24-mj-02319-DUTY** |
| ERIC ADRIAN GUZMAN, | |
| Defendant | |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of March 9, 2024, in the county of Los Angeles in the Central District of California, the

defendant violated:

      *Code Section*                                     *Offense Description*

      18 U.S.C. § 922(g)(1)                    Felon in Possession of Ammunition

This criminal complaint is based on these facts:

   *Please see attached affidavit.*

☒ Continued on the attached sheet.

 

                                                      */s/ Robert C. McElroy*
                                                   *Complainant's signature*

                                      Robert C. McElroy, Special Agent
                                         *Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:     April 19, 2024

City and state:   Los Angeles, California                   *Judge's signature*

                                      Hon. A. Joel Richlin, U.S. Magistrate Judge
                                         *Printed name and title*

AUSA: Brandon E. Martinez-Jones, x7167

**AFFIDAVIT**

I, Robert C. McElroy, being duly sworn, declare and state as follows:

## I. **PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of a criminal complaint and arrest warrant against ERIC ADRIAN GUZMAN ("GUZMAN") for a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of Ammunition.

2.    This affidavit is also made in support of an application for a warrant to search: (1) a black Apple iPhone, in a black case with the phrase "$ckrooks1010" written on the back (the "SUBJECT DEVICE"), as described more fully in Attachment A-1; and (2) the person of GUZMAN, as described more fully in Attachment A-2.  The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 922(g)(1): Felon in Possession of a Firearm and Ammunition, and 922(o): Possession of a Machinegun (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, and B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.

Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

4.     I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since October 2019.  I am currently assigned to the Los Angeles Field Division Lancaster Resident Agency, which is responsible for investigating violent crimes, white-collar crimes, and crimes against children in the cities that fall within the Lancaster Resident Agency's area of responsibility.

5.     Since becoming an FBI SA, I have received formal training at the FBI Training Academy in Quantico, Virginia. This training included segments on conducting criminal investigations, narcotics identification, organized crime, and other law enforcement topics.  During the time I have been employed by the FBI, I have participated in investigations relating to kidnapping, extortion, criminal threats, fugitives, homicide, Hobbs Act robberies, murder-for-hire, and other violent crimes.  I have participated in many aspects of criminal investigations, including, but not limited to, reviewing evidence, the issuance of subpoenas, the analysis of pen and trap and trace records, consensually monitored telephone calls, conducting physical and electronic surveillance, working with informants, and the execution of search and arrest warrants.

III.  **SUMMARY OF PROBABLE CAUSE**

6.    On March 9, 2024, LASD deputies were conducting a
vehicle theft/tampering investigation of four men who were
suspiciously loitering around a parked vehicle in an area known
for high levels of criminal activity.  As the investigation
proceeded, one of the men--later identified as GUZMAN--fled from
deputies, one of whom pursued on foot.

7.    During the foot pursuit, a gun fell out of the right
pocket/waistband area of GUZMAN's pants.  After a foot pursuit
through an apartment complex, across a street, and into a dirt
lot, during which the deputy unsuccessfully deployed his taser,
GUZMAN grappled with the deputy on the ground and grabbed at the
deputy's neck and face.  The deputy eventually subdued GUZMAN
and arrested him.

8.    GUZMAN is a convicted felon with a 2018 California
conviction for carjacking.

9.    The gun that fell out of GUZMAN's pocket/waistband
during the foot pursuit was loaded with sixteen rounds of
ammunition, all of which were manufactured outside of California
and thus must have traveled in interstate commerce.  The gun was
also equipped with an auto-sear device that allowed it to
function as a fully automatic machinegun.

IV.  **STATEMENT OF PROBABLE CAUSE**

A.    **LASD Deputies Attempt to Detain GUZMAN on Suspicion of
      Car Theft or Tampering, GUZMAN Flees, and GUZMAN Drops
      a Gun**

10.   Based on my review of reports prepared by LASD
Deputies Logan Simi, Shane Quesada, and others, my review of

bodyworn-camera footage, and my own knowledge of this
investigation, I know the following:

      a.    In the early morning of March 9, 2024, LASD
Deputies Simi and Quesada were patrolling the area of Division
Street and Avenue J-5 in the City of Lancaster in a marked LASD
vehicle.  At approximately 4:50 A.M., Simi and Quesada drove
their vehicle into an alleyway behind an apartment complex
located at 44040 Division Street, Lancaster, California.
Deputies have routinely patrolled this alleyway due to previous
reports of vehicle theft, firearm-related incidents, and an
increase in gang graffiti in the area related to the street gang
Brown Pride Surenos 13 ("BPS").[1]

      b.    As the deputies drove southbound down the
alleyway, they observed a male with a dark beanie and dark
clothing ("Unknown Male 1") run into the apartment complex.
Deputies then noticed two Hispanic men, one wearing a black
pull-over hoodie with white strings, gray sweatpants, and black
Nike shoes (later identified as GUZMAN), and one wearing black
pants and a black jacket with the jacket's hood over his head
("Unknown Male 2").

      c.    GUZMAN was near the driver's door of a gray BMW
sedan, which was parked in a parking spot in a carport for the

_____

      [1] BPS is a multi-generational Hispanic street gang known to
operate in Lancaster and Northridge.  The gang has been under
investigation for numerous firearms-related incidents and are
known to sell narcotics and firearms for profit.  The gang
typically includes the number "13" in their street graffiti to
show their allegiance to the Mexican Mafia prison gang, who use
the 13 to signify the thirteenth letter of the alphabet, "M".

apartment complex.  Unknown Male 2 was near the passenger door of the BMW.

       d.   The deputies also observed a fourth man wearing a blue jacket, a black hat with a yellow "P" logo on its front,[2] and dark colored pants ("Unknown Male 3").  Unknown Male 3 was crouched down behind the BMW.

       e.   As the deputies' patrol vehicle approached, GUZMAN and Unknown Male 2 started to walk away from the BMW. Unknown Male 3 stood up from his crouching position.

       f.   Based on their observations and the recent reports of criminal activity involving vehicle tampering and theft, as well as other crimes, in this area, Deputies Simi and Quesada attempted to detain GUZMAN and Unknown Males 2 and 3 for further investigation on suspicion of vehicle theft or tampering.

       g.   Deputy Simi ordered GUZMAN and Unknown Males 2 and 3 to walk to his patrol vehicle and place their hands on its hood.  Unknown Males 2 and 3 complied.  GUZMAN, however, refused and walked toward another vehicle parked in the alleyway, eventually coming to stand so that the lower half of his body was behind the front hood of that other vehicle.  As Unknown Males 2 and 3 walked toward the patrol vehicle, Deputy Simi noticed that they had bulky items in the pocket/waistband areas of their pants, which Deputy Simi believed were firearms.

---

    [2] BPS gang members are known to wear clothing with the letter "P" to represent their gang.

h.    Because GUZMAN and Unknown Males 2 and 3 outnumbered Deputies Simi and Quesada, and because the deputies believed that the men may be armed, Deputy Simi sent a radio request for additional deputies to respond and assist.

i.    While waiting for the additional deputies, GUZMAN eventually complied with Deputy Simi's commands and walked to the front of the patrol vehicle.  GUZMAN was slightly hunched over as he walked towards the patrol vehicle, consistent with him attempting to conceal a firearm in his pants.

j.    After GUZMAN reached the front of the patrol car, Deputy Simi began to conduct a pat-down search of Unknown Male 2's waistband area for weapons.  At the same time, a second LASD vehicle with additional deputies arrived at the scene.  GUZMAN looked up at the additional deputies as they arrived, turned around, and began to run southbound down the alleyway.

k.    Deputy Simi ran after GUZMAN.  Within seconds of the foot pursuit beginning, a black handgun fell out of the right pocket/waistband area of GUZMAN's pants.  Screen captures

from body-worn-camera footage depicting the firearm falling out
of GUZMAN's waistband area are attached below:




l.    GUZMAN turned into the apartment complex, ran
through its courtyard, and exited onto Division Street.  As
GUZMAN ran, Deputy Simi deployed his taser gun at GUZMAN.
GUZMAN fell down in the middle of Division Street, which led
Deputy Simi to believe that his taser had disabled GUZMAN.
Deputy Simi stopped and waited for other units to assist with
GUZMAN's apprehension.

m.    Deputy Simi's taser, however, had missed.  GUZMAN
stood back up.  Deputy Simi grabbed GUZMAN's left shoulder and
hand and repeated his command not to move.  GUZMAN ignored the
command, broke free from Deputy Simi, and continued to run
across Division Street toward a dirt lot.

n.    GUZMAN and Deputy Simi grappled on the ground of
the dirt lot.  Laying on his back with Deputy Simi on top of
him, GUZMAN grabbed at Deputy Simi's face and throat and refused

to surrender his hands for arrest.  Deputy Simi struck GUZMAN in the face with his fist multiple times until GUZMAN complied and, with assistance from other deputies who had arrived, Deputy Simi was able to place GUZMAN in handcuffs.

        o.    LASD arrested GUZMAN and, incident to his arrest, LASD deputies found the SUBJECT DEVICE in GUZMAN's pocket.

        p.    After GUZMAN fled and Deputy Simi pursued, Unknown Males 2 and 3 fled from deputies and ran into the apartment complex through the same entryway through which GUZMAN and Deputy Simi had run.  Two further men emerged from inside the BMW and also ran from the deputies.

        q.    GUZMAN refused to be interviewed by LASD deputies.

      **B.**    **LASD Recovers GUZMAN's Gun and Other Firearms and Determines That GUZMAN's Gun Is a Fully Automatic Machinegun**

    11.    Based on my review of reports prepared by LASD Deputies Simi, Quesada, and others, my review of bodyworn-camera footage, and my own knowledge of this investigation, I know the following:

        a.    After Deputy Simi apprehended GUZMAN, LASD Deputy C. Rozelle recovered the black gun that had fallen from GUZMAN's right pocket/waistband and landed on the ground.  This gun is a 9mm-caliber, Polymer 80 ghost gun with no serial number.  It was equipped with a high-capacity magazine containing approximately 15 rounds of 9mm ammunition.  It had one 9mm round in the chamber and was equipped with a Glock auto-sear, which turns a

semi-automatic handgun into a fully automatic firearm, or
"machinegun."

     b.   Approximately fifteen feet from an exit gate of
the apartment complex, along the path on which GUZMAN and
Unknown Males 2 and 3 had run, Deputy Quesada recovered a black,
semi-automatic, AR-style rifle with no serial number, which was
loaded with approximately twenty-one .556 rounds of ammunition,
including one in the chamber.

     c.   Underneath the rear right corner of the BMW where
the deputies first encountered GUZMAN, Deputy Quesada recovered
a tan, semi-automatic, Polymer-80 handgun without a serial
number.  This gun was equipped with a high-capacity magazine
containing approximately 15 rounds of 9mm ammunition.  The gun
also had one 9mm round in its chamber.

   12.  Based on my review of a Laboratory Examination Report
prepared by LASD's Scientific Services Bureau and my own
training and experience with firearms and firearms offenses, I
know the following:

     a.   LASD Senior Criminalist Tracy Peck examined and
function-tested the gun that fell out of GUZMAN's pants.  Senior
Criminalist Peck determined that the gun was equipped with a
semi-/fully automatic "Selector Switch" assembly installed on
its slide, allowing the firearm to be switched from a semi-
automatic firing mode--that is, one in which the weapon will
automatically chamber a new round of ammunition but fire only
one round per release and pull of the trigger--to a fully
automatic firing mode--that is, one in which the weapon will

fire more than one round of ammunition by a single pull of the
trigger and without manual reloading.

   b.  When Senior Criminalist Peck test fired the gun
in both semi- and fully automatic modes, it fired in both
configurations.

  **C.** **GUZMAN'S Criminal History**

  13. On April 12, 2024, I reviewed certified conviction
documents for GUZMAN and learned that GUZMAN has previously been
convicted of the following felony crime punishable by a term of
imprisonment exceeding one year:  On or about April 19, 2018, a
violation of California Penal Code § 215(a): Carjacking, in the
Superior Court for the State of California, County of Los
Angeles, Case Number MA07283401.

  14. On the same date and in the same case, GUZMAN was also
convicted of violating California Vehicle Code § 2800.2, Evading
a Peace Officer with Willful or Wanton Disregard for the Safety
of Persons or Property.

  **D.** **Interstate Nexus**

  15. Based on my review of an April 15, 2024, draft report
prepared by FBI Supervisory Special Agent Christopher C. Harris,
I know that on April 12, 2024, Supervisory SA Harris, who is an
ATF Interstate Nexus Expert, examined the handgun and ammunition
that fell out of GUZMAN's pocket/waistband area and confirmed
that the ammunition was manufactured outside of the State of
California.  Because the ammunition was found in California, I
believe that it has traveled in and affected interstate
commerce.  Supervisory SA Harris was unable to determine the

origin of the handgun because it was a ghost gun with no serial number.

      **E.**    **There is Probable Cause to Believe That Evidence of the SUBJECT OFFENSES Will Be Found on the SUBJECT DEVICE and on GUZMAN's Person**

    16.  From my training, personal experience conducting firearms investigations, and the collective experiences related to me by other law enforcement officers who conduct who also conduct firearms investigations, I am aware of the following:

        a.  Persons who illegally possess, purchase, or sell firearms, including machineguns, often store firearms, prohibited items, and evidence of possession and sale on their person, in their residence, and in vehicles that they control.

        b.  Persons who illegally possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future sales, purchases, or referrals. Such information is also kept on digital devices on their person and in backpacks or purses in their vicinity.

        c.  Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These

photographs and recordings are often shared via social media, text messages, and over text messaging applications. These may include recordings or photographs that may reveal both that a person has possessed a particular firearm or ammunition (e.g., photographs of them holding a particular firearm) and also that person's knowledge of the firearm's characteristics and functionalities (e.g., videos of them firing a fully automatic firearm). Digital devices containing such evidence are often kept on the person.

        d.    Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale or possession of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms. These communications may include information or references that tend to establish a person's knowledge of a

12

firearm's characteristics and functionalities (e.g., text or
social-media messages describing whether a firearm is semi-
automatic or equipped with a device that renders it capable of
fully automatic fire).  Digital devices containing such evidence
are often kept on the person.

      e.   Individuals engaged in the illegal purchase or
sale of firearms and other contraband often use multiple digital
devices to conceal their identities when engaging in firearms
transactions and to make detection and identification by law
enforcement more difficult.  Individuals engaged in such illegal
firearms transactions often carry one or more digital devices
with them so that they are able to stay in frequent
communication with potential suppliers or customers.

17.  Based on all the above facts, I submit that there is
probable cause to believe that evidence of the SUBJECT OFFENSES
will be found on the SUBJECT DEVICE and on GUZMAN's person,
including in digital devices thereon.  For example, text
messages, social-media messages, and/or photographs on the
SUBJECT DEVICE and on any digital devices on GUZMAN's person may
tend to show that GUZMAN unlawfully possessed the AR-style rifle
with no serial number and/or the tan Polymer-80 handgun found on
the ground of the apartment complex where LASD first encountered
GUZMAN.

## V.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[3]

18.   Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,

---

[3] As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

> c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

> d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

19.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

15

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

20.   The search warrant requests authorization to use the biometric unlock features of any digital devices found on the person of GUZMAN (but not as to the SUBJECT DEVICE), based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's

16

fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and that is found on the person of GUZMAN, as described further in Attachment A-2: (1) depress GUZMAN's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of GUZMAN's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

21.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. **CONCLUSION**

22.   For all of the reasons described above, there is probable cause to believe that GUZMAN has committed a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of Ammunition.

There is also probable cause to believe that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE as described in Attachment A-1 and the person of GUZMAN as described in Attachment A-2.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this __19th__ day of April, 2024.

_____
HONORABLE A. JOEL RICHLIN
UNITED STATES MAGISTRATE JUDGE

18